Filed 4/2/15  Tawfik-Oshana v. Wells Fargo Advisors CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| MERA TAWFIK-OSHANA,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>WELLS FARGO ADVISORS, LLC et al.,<br><br>Defendants and Respondents. | H039626<br>(Santa Clara County<br>Super. Ct. No. 1-12-CV-222670) |

Plaintiff Mera Tawfik-Oshana appeals from a judgment entered after the trial court denied her petition to vacate an arbitration award in favor of defendants Wells Fargo Advisors, LLC, also known as Wachovia Securities, LLC, formerly doing business as Wells Fargo Investments, LLC; Robert Kricena; and George von Zedlitz (collectively, Wells Fargo) and granted defendants' petition to confirm the award.  She contends that (1) the trial court's finding that she failed to participate in the arbitration was "without foundation and flawed," (2) the arbitrator was "unqualified," (3) her Labor Code claims were not arbitrable, (4) her Business and Professions Code claim was not arbitrable, and (5) the arbitration agreements were unconscionable and unenforceable under *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83 (*Armendariz*), abrogated in part on another ground in *AT&T Mobility LLC v. Concepcion* (2011) __U.S.__ [131 S.Ct. 1740, 1746] (*Concepcion*).  We affirm.

## I. Background

Tawfik-Oshana was working as an investment advisor for Washington Mutual Bank (WAMU) and was "very successful in that role" when she was offered a position as a senior financial consultant for Wells Fargo in the fall of 2007. She claims that the senior regional sales manager who offered her the position promised her a $650,000 "sign-on bonus" and told her that she would be eligible for an additional $350,000 bonus in two years if she continued to perform at the level she had attained during the past year at WAMU. Tawfik-Oshana accepted Wells Fargo's written offer of employment on December 13, 2007.

On December 18, 2007, she signed a Form U4 Uniform Application for Securities Industry Registration or Transfer (Form U4). Form U4 is a Financial Industry Regulatory Authority (FINRA) form that all "associated persons" of broker dealers, investment advisors, and securities issuers are required by law to sign before engaging in securities transactions as representatives of FINRA-member firms like Wells Fargo.[1] (17 C.F.R. § 240.15b7-1; 10 Cal. Code Regs., § 260.210.) "The Form U4 is a contract between the regulatory organization . . . and the individual registrant. [Citation.]" (*Valentine Capital Asset Management, Inc. v. Agahi* (2009) 174 Cal.App.4th 606, 613 (*Valentine*).)

---

[1] "FINRA is the self-regulatory organization [SRO] for securities brokers and brokerage firms and is the successor to the National Association of Securities Dealers, Inc. (NASD). [Citation.]" (*Ronay Family Limited Partnership v. Tweed* (2013) 216 Cal.App.4th 830, 834, fn. 1 (*Ronay*).) "FINRA regulates member brokerage firms and exchange markets, subject to oversight by the SEC." (*Mathis v. United States SEC* (2d. Cir. 2012) 671 F.3d 210, 215 (*Mathis*).) "FINRA was created in 2007 through the consolidation of the [NASD] and the member regulation, enforcement, and arbitration operations of the New York Stock Exchange. [Citations.]" (*Sacks v. SEC* (9th Cir. 2011) 648 F.3d 945, 948, fn. 1.) "On July 26, 2007, . . . the NASD changed its corporate name to the Financial Industry Regulatory Authority, Inc. ('FINRA'). [Citations.]" (*Mathis*, at p. 211, fn. 1.)

The Form U4 that Tawfik-Oshana signed contained an arbitration provision stating, "I agree to arbitrate any dispute, claim or controversy that may arise between me and my *firm*, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the *SROs* indicated in Section 4 . . . as may be amended from time to time and that any arbitration award rendered against me may be entered as a judgment in any court of competent *jurisdiction.*" Tawfik-Oshana indicated one SRO in section 4, the NASD.

Tawfik-Oshana resigned her position at WAMU on December 22, 2007, and reported for orientation at Wells Fargo that same day. She was given various documents to sign, including a promissory note "[i]n consideration of a loan of six hundred fifty thousand dollars" from Wells Fargo. The note provided that Wells Fargo would forgive the loan principal and the interest on the loan in 84 equal monthly increments commencing on the first day of the month following disbursement of the proceeds and continuing each month until the loan was repaid. The note stated that "[t]he compensation and withholding will be reported in the appropriate pay period for each monthly forgiveness." The note also provided that the outstanding balance would "immediately become due and payable" upon the happening of specified events of default, including termination of employment "for any reason whatsoever."

The note contained its own arbitration provision. That provision stated that "[a]ny controversy regarding the validity, enforcement or construction of this Note or any dispute concerning the Undersigned's employment or termination of employment with [Wells Fargo] shall be resolved by arbitration under the then-prevailing Rules of the [NASD]. Any state or federal court having jurisdiction to enter such an award may enter judgment upon any award rendered by the arbitrator(s) . . . ." The note further provided that "[i]n the event any action or lawsuit is required to be brought for collection of any amount under this Note, the Undersigned promises to pay reasonable attorney's fees and costs, including all fees and costs involved in collection."

3

The note stated that "[t]he Undersigned has reviewed the terms of this Note and has participated in its drafting, and agrees that the rule of construction by which ambiguities are resolved against the drafting party shall not apply in any interpretation of it. . . . [¶] The Undersigned executes this Note without reliance on any oral representations. This Note contains the entire agreement between the Undersigned and [Wells Fargo] with respect to the matters addressed in it, and supersedes all prior agreements, written or oral, between the Undersigned and [Wells Fargo] on such matters. No other agreement, statement of [*sic*] promise made by any party with respect to any of the matters addressed in this note will be binding or valid."

Tawfik-Oshana received a check for $650,000 about a week after she signed the note. She resigned from Wells Fargo four years later, in February 2011. On September 6, 2011, Wells Fargo demanded repayment of the balance owing on the note.

On February 17, 2012, Wells Fargo initiated an arbitration proceeding before FINRA. Wells Fargo declared in its statement of claim in arbitration that it was a broker-dealer registered with the United States Securities and Exchange Commission [SEC] "and, among others, the State of California." It asserted that FINRA had jurisdiction over the claim because Wells Fargo was a member of FINRA (formerly known as the NASD) and Tawfik-Oshana was at all times during her employment with Wells Fargo "an associated person of a member of FINRA." Wells Fargo alleged that Tawfik-Oshana owed $386,635.68 plus interest and expenses under the note.

Tawfik-Oshana ignored the pending arbitration proceeding and filed suit against Wells Fargo on April 17, 2012. Her complaint asserted causes of action for violations of the Labor Code, violation of Business and Professions Code section 17200, misrepresentation, and breach of oral contract. She alleged that she was enticed to join Wells Fargo with oral promises of a $650,000 "sign-on bonus" and a possible $350,000 additional bonus in two years. She was "surprised and shocked" to learn that the "sign-on bonus" would be treated as a loan. She asserted that she was given no opportunity to

4

negotiate the loan or to seek legal advice before she signed it. She "felt she had no choice but to sign" it because she had ended her previous employment that morning. Within weeks after signing the note, she transferred $20 million of client brokerage and annuity accounts from WAMU to Wells Fargo. She claimed that her working environment began to deteriorate after that and that she began to encounter "other work conditions that were materially different from what she had been promised." The "outright hostile work environment" and Wells Fargo's failure to correct her compensation package "forced" her to resign on February 5, 2011. The complaint prayed for damages and for a declaration that the arbitration provision in the note was unconscionable and therefore unenforceable.

On April 23, 2012, Tawfik-Oshana filed a "Notice and Objection" with FINRA. The document explained "as a courtesy" that she had filed suit against Wells Fargo and objected "to any assertion of jurisdiction over any claims between her and WELLS by FINRA, NASD, or any other arbitral forum or entity."

On May 8, 2012, FINRA notified Tawfik-Oshana that the case was ready for the appointment of an arbitrator. The letter warned her that if FINRA did not receive her arbitrator ranking lists by May 29, 2012, "you will be deemed to have accepted all Arbitrators on the lists." In a separate letter, FINRA informed her that it had not received her statement of answer and that if that and other deficiencies were not corrected within 30 days, "the panel will proceed with the arbitration as though the deficient counterclaim, cross claim or third party claim had not been made." In a third letter, FINRA informed her that because it had not received her statement of answer, "pursuant to Code of Arbitration Procedure Rule 13806, no hearing will be held. This case will be decided based on the pleadings and other materials submitted by the parties."

On May 23, 2012, Wells Fargo filed a petition in the trial court to compel arbitration and to stay Tawfik-Oshana's lawsuit. Wells Fargo asserted that the Federal Arbitration Act (9 U.S.C. §§ 1-16 (FAA)) required and state law encouraged enforcement

5

of the arbitration agreement in the Form U4, which was "a contract evidencing a transaction involving commerce" under the FAA. Wells Fargo stated that it had not waived its right to arbitration and that no grounds existed for revocation of the agreement.

On May 24, 2012, FINRA confirmed to Tawfik-Oshana's counsel that without a court order staying the arbitration, a stipulation extending the answer deadline, or the filing of an answer, the matter would be "ripe to be decided on the papers" as soon as the arbitrator was appointed and entered a ruling. On May 31, 2012, the trial court stayed the arbitration proceedings pending a ruling on Wells Fargo's petition to compel arbitration.

Tawfik-Oshana opposed the petition to compel arbitration on the ground that the arbitration agreements were unenforceable. She argued that the arbitration provision in the note violated California law and public policy and was procedurally and substantively unconscionable and therefore unenforceable, that the Form U4 arbitration provision was unenforceable "for the same reasons," and that her Business and Professions Code claim was not arbitrable at all because she was "functioning as a private attorney general in seeking an injunction . . . on behalf of the general public."

In July 2012, the trial court granted Wells Fargo's petition to compel arbitration and stayed Tawfik-Oshana's lawsuit. The order stated that "an employee signing a written contract is conclusively presumed to know its contents and to assent to them. [Citation.] The evidence . . . indicates that the Plaintiff signed and executed two separate documents containing an arbitration provision . . . . In reviewing the recent case of *Hoover v. American Income Life Insurance Company* [(2012) 206 Cal.App.4th 1193 (*Hoover*)]), the Court finds that there is sufficient evidence to conclude that the [FAA] applies and therefore the general rule that an arbitration agreement does not apply to an action enforcing statutes governing collection of unpaid wages is inapplicable."

Tawfik-Oshana sought writ relief. This court summarily denied her petition. (*Tawfik-Oshana v. Superior Court*, H038776, Nov. 27, 2012.)

6

On July 30, 2012, FINRA notified Tawfik-Oshana that the arbitration would proceed with or without her participation. FINRA sent her a confirming e-mail on August 8, 2012. By letter dated August 18, 2012, it informed her that an arbitrator had been appointed and that case materials would be forwarded to the arbitrator for a decision without a hearing.

Wells Fargo's "Final Submission" to the arbitrator argued that the terms of the note were clear and unambiguous, that Tawfik-Oshana had a duty to learn and know the contents of the contract before she signed it, and that she should be held to her contractual obligations. Wells Fargo reiterated that Tawfik-Oshana never filed an answer to its statement of claim.

The arbitrator awarded Wells Fargo $386,723.18 in compensatory damages, interest at a rate of 4.13 percent per year until the award was paid in full, and $12,586.03 in attorney's fees and costs.

Tawfik-Oshana petitioned to vacate the award on grounds that "the misconduct of a neutral arbitrator substantially prejudiced [her] rights" and "the arbitrator exceeded his . . . authority, and the award cannot not be fairly corrected." She argued that the arbitrator "did not provide a written decision . . . with regard to her unwaivable statutory rights under the . . . Labor Code," that the decision violated her statutory rights, and that "[t]he arbitration was procedurally and substantively unconscionable because it was a mandatory agreement created by the employer on a take-it-or leave it [*sic*] basis and allowed an assessment of fees and costs against the employee."

Wells Fargo opposed Tawfik-Oshana's petition and petitioned to confirm the award. Wells Fargo argued among other things that any alleged failure of the arbitrator to rule on Tawfik-Oshana's Labor Code and declaratory relief claims (which she did not raise as defenses or counterclaims) was "entirely Plaintiff's fault" and did not in any event constitute grounds to vacate the award.

7

On March 20, 2013, the trial court issued a tentative ruling in favor of Wells Fargo. Tawfik-Oshana did not request oral argument. In a single order filed on April 3, 2013, the trial court denied Tawfik-Oshana's petition to vacate the award and granted Wells Fargo's petition to affirm it. The order stated that Tawfik-Oshana "had the opportunity to participate in the [arbitration] process . . . and chose not to do so. Accordingly, the Court finds that there is no valid legal or factual basis to set aside or vacate the arbitration award."

Tawfik-Oshana filed a timely notice of appeal.

## II. Discussion

### A. Appealability

Tawfik-Oshana asserts that her appeal is from a judgment entered on May 2, 2013. There is no judgment in the record. Further, her notice of appeal asserted that she was appealing from an April 8, 2013 "Order Confirming Arbitration Award under CCP section 1285 et seq." There is no order with that caption or any order with that date in the record. Thus, we must as a preliminary matter determine whether this appeal is properly before us. (*Olson v. Cory* (1983) 35 Cal.3d 390, 398.)

The right to appeal is "wholly statutory." (*Powers v. City of Richmond* (1995) 10 Cal.4th 85, 109.) "[O]nce a petition to confirm, correct, or vacate [an arbitration award] is filed, the superior court has only four choices: It may (1) confirm the award, (2) correct the award and confirm it as corrected, (3) vacate the award, or (4) dismiss the proceedings." (*Sunnyvale Unified School Dist. v. Jacobs* (2009) 171 Cal.App.4th 168, 175.) "If the trial court which does not dismiss the petition also does not correct or vacate an arbitration award, it *must* confirm the award. Entry of judgment in conformity

8

therewith is required (Code Civ. Proc., § 1287.4),[2] resulting in an appealable judgment under . . . section 1294, subdivision (d)." (*Law Offices of David S. Karton v. Segreto* (2009) 176 Cal.App.4th 1, 9.)

Here, the trial court entered its "Order Denying Plaintiff's Petition to Vacate Arbitration Award and Granting Defendant's Petition to Confirm Arbitration Award" on April 3, 2013. We assume that the "April 8, 2013" date in Tawfik-Oshana's notice of appeal was a typographical error and that she intended to appeal from the April 3, 2013 order. "However, neither an order denying a petition to vacate the award under . . . section 1286.2 nor an order confirming an award is directly appealable. [Citations.] Review of an order denying a petition to vacate may only be had upon appeal from the *judgment of confirmation* or by writ of mandate. [Citation.]" (*Ahdout v. Hekmatjah* (2013) 213 Cal.App.4th 21, 30 (*Ahdout*); § 1294.) As the record does not include a copy of the judgment, we take judicial notice on our own motion of the trial court's public record docket entries, which reflect entry of judgment on May 2, 2013. (Evid. Code, § 452, subd. (d); see *Truong v. Nguyen* (2007) 156 Cal.App.4th 865, 872.) We treat this appeal as taken from the May 2, 2013 judgment. (*Ahdout*, at p. 30.)

## B. Applicable Law and Standard of Review

California and federal law favor the enforcement of contractual arbitration provisions. (§ 1281; 9 U.S.C. § 2.) The FAA governs arbitration provisions in written contracts "evidencing a transaction involving commerce . . . ." (9 U.S.C. § 2.) Both the Form U4 and the note that Tawfik-Oshana signed fit that definition. (*Baker v. Aubry* (1989) 216 Cal.App.3d 1259, 1263 (*Baker*); see *Gilmer v. Interstate/Johnson Lane Corp.* (1991) 500 U.S. 20, 21-25 [implicitly holding FAA applicable to Form U4 registration];

_____

2  Subsequent statutory references are to the Code of Civil Procedure unless otherwise indicated.

9

see also *Cortina v. Citigroup Global Markets, Inc.* (S.D. Cal., Aug. 19, 2011, Civ. No. 10cv2423-L(RBB)) 2011 U.S. Dist. Lexis 92954 at pp. 1, 4, & fn. 1 [holding that FAA governed dispute arising out of promissory note "related to a signing bonus [that] Petitioner received at the beginning of his employment as a financial advisor . . . ."].) The FAA governs here.

"[T]he basic purpose of the [FAA] is to overcome courts' refusals to enforce agreements to arbitrate." (*Allied-Bruce Terminix Cos. v. Dobson* (1995) 513 U.S. 265, 270.) Section 2 is "the primary substantive provision of the Act, declaring that a written agreement to arbitrate 'in any . . . contract . . . involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.' [Citation.]" (*Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.* (1983) 460 U.S. 1, 24.) " 'The effect of the section is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act.' [Citation.] Enacted pursuant to the Commerce Clause, . . . this body of substantive law is enforceable in both state and federal courts. [Citation.] . . . '[I]n enacting [section] 2 . . . , Congress . . . withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration.' [Citation.] 'Congress intended to foreclose state legislative attempts to undercut the enforceability of arbitration agreements.' [Citation.] Section 2, therefore, embodies a clear federal policy of requiring arbitration unless the agreement to arbitrate is not part of a contract evidencing interstate commerce or is revocable 'upon such grounds as exist at law or in equity for the revocation of any contract.' [Citation.]" (*Perry v. Thomas* (1987) 482 U.S. 483, 489 (*Perry*).) "[N]othing in the Act indicat[es] that the broad principle of enforceability is subject to any additional limitations under state law." (*Id.* at pp. 489-490.)

The savings clause in section 2 of the FAA "preserves generally applicable contract defenses." (*Concepcion*, *supra*, __ U.S. __ [131 S.Ct. at p. 1748].) Under that

10

clause, " '[s]tate law, whether of legislative or judicial origin, is applicable *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally.' " (*Doctor's Assocs., Inc. v. Casarotto* (1996) 517 U.S. 681, 685 (*Doctor's Assocs.*).) "Thus, generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening [section] 2." (*Doctor's Assocs.*, at p. 687.) "Courts may not, however, invalidate arbitration agreements under state laws applicable *only* to arbitration provisions." (*Ibid.*) "By enacting [section] 2, . . . Congress precluded States from singling out arbitration provisions for suspect status, requiring instead that such provisions be placed 'upon the same footing as other contracts.' [Citation.]" (*Doctor's Assocs.*, at p. 687.)

The FAA does not preempt state law mechanisms for enforcing or vacating arbitration awards, because those mechanisms are procedural rather than substantive. (*Cable Connection, Inc. v. DIRECTV, Inc.* (2008) 44 Cal.4th 1334, 1350-1351 (*DIRECTV*).) " '[T]he United States Supreme Court does not read the FAA's procedural provisions to apply to state court proceedings.' " (*DIRECTV*, at p. 1351; see *Southland Corp. v. Keating* (1984) 465 U.S. 1, 16, fn. 10 (*Southland*).) " '[N]othing in the legislative reports and debates [on the FAA] evidences a congressional intention that postaward and state court litigation rules be preempted so long as the basic policy upholding the enforceability of arbitration awards remained in full force and effect.' [Citation.]" (*DIRECTV*, at p. 1352.)

Section 1286.2 lists the exclusive grounds for vacating a nonjudicial arbitration award. (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 28.) It provides in pertinent part that "the court shall vacate the award if the court determines any of the following: [¶] . . . [¶] (3) The rights of the party were substantially prejudiced by misconduct of a neutral arbitrator. [¶] (4) The arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy

11

submitted. . . . ." (§ 1286.2, subd. (a).) "[A]n arbitrator exceeds his powers by acting without subject matter jurisdiction, deciding an issue that was not submitted to arbitration, arbitrarily remaking the contract, upholding an illegal contract, issuing an award that violates a well-defined public policy or statutory right, fashioning a remedy that is not rationally related to the contract, or selecting a remedy not authorized by law. [Citations.]" (*Gravillis v. Coldwell Banker Residential Brokerage Co.* (2010) 182 Cal.App.4th 503, 511 (*Gravillis*).)

"The decision to confirm or vacate an arbitration award lies with the trial court." (*Betz v. Pankow* (1993) 16 Cal.App.4th 919, 923.) "We review de novo the trial court's order confirming the arbitration award." (*Gravillis*, *supra*, 182 Cal.App.4th at p. 511; see *Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, 376, fn. 9.) "We must accept the trial court's findings of fact if substantial evidence supports them, and we must draw every reasonable inference to support the award." (*Alexander v. Blue Cross of California* (2001) 88 Cal.App.4th 1082, 1087.)

### C. Failure to Participate in the Arbitration Process

Tawfik-Oshana challenges the trial court's conclusion that she failed to participate in the arbitration process as "without foundation and flawed." She argues that "the record discloses no such 'failure.' " We disagree. The arbitrator expressly found that Tawfik-Oshana did not sign the February 2012 submission agreement. The record further establishes that she did not file a statement of answer even after FINRA warned her in writing that she needed to correct "all deficiencies" within 30 days to avoid having the matter decided without any answer or counterclaim from her and without a hearing. Even after the trial court ordered the matter to arbitration, Tawfik-Oshana declined to submit an answer or a counterclaim. The record amply supports the trial court's finding that she failed to participate in the arbitration process.

FINRA Code of Arbitration Procedure, rule 13806 describes the procedure to be followed in such situations. The rule applies in arbitrations involving a FINRA member's claim that an associated person failed to pay money owed on a promissory note. It provides that if the associated person does not file an answer, a single arbitrator will be appointed, no initial prehearing conference or hearing will be held, and the arbitrator will render an award based on the pleadings and other materials submitted by the parties.

Tawfik-Oshana maintains that she did participate in the arbitration by filing her "Notice and Objection" and "by allowing all her Superior Court documents and pleadings to be reviewed" by the arbitrator. She provides no record cite to support the latter assertion. "'It is the duty of counsel to refer the reviewing court to the portion of the record which supports appellant's contentions on appeal.'" (*Sakaguchi v. Sakaguchi* (2009) 173 Cal.App.4th 852, 862.) "Each and every statement in a brief regarding matters that are in the record on appeal, whether factual or procedural, must be supported by a citation to the record. This rule applies regardless of where the reference occurs in the brief." (*Lona v. Citibank, N.A.* (2011) 202 Cal.App.4th 89, 96, fn. 2; Cal. Rules of Court, rule 8.204(a)(1)(C).) "'The appellate court is not required to search the record on its own seeking error.' [Citation.] Thus, '[i]f a party fails to support an argument with the necessary citations to the record, . . . the argument [will be] deemed to have been waived. [Citations.]" (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246-1247.)

To the extent that Tawfik-Oshana may be relying on the arbitrator's statement in the award "acknowledg[ing] that he . . . read the pleadings and other materials filed by the parties," she takes that statement out of context. We read the acknowledgment to refer to the pleadings and other materials that the parties filed with FINRA. There is no evidence in the record that the arbitrator was provided with or that he reviewed any trial court documents. The record establishes that the parties filed with FINRA and that the arbitrator reviewed (1) Wells Fargo's signed submission agreement and its statement of

13

claim, to which it attached a copy of the note and a copy of its demand letter, (2) Tawfik-Oshana's two-page "Notice and Objection," and (3) Wells Fargo's "Final Submission," to which it attached another copy of the note, another copy of Tawfik-Oshana's "Notice of Objection," a copy of the trial court's order granting the petition to compel arbitration and staying Tawfik-Oshana's lawsuit, a "Summary of Amounts Due," a copy of a FINRA form reflecting Tawfik-Oshana's termination date, another copy of the demand letter, and a copy of the $650,000 check that Tawfik-Oshana received. We reject Tawfik-Oshana's argument that she participated in the arbitration by "allowing" the arbitrator to review documents she filed in the trial court.

To the extent that Tawfik-Oshana contends that the arbitrator committed misconduct by failing to decide issues that she raised in the trial court but never submitted for arbitration, we reject that contention as well. Her appellate briefs contain numerous general assertions that the arbitrator "rejected" arguments from her trial court pleadings and "never decided" various other issues that she raised in the trial court. There is no evidence that the arbitrator was aware of those arguments. Because Tawfik-Oshana failed to present these arguments for decision, she cannot fault the arbitrator for failing to decide them.

### D. Qualifications of the Arbitrator

Tawfik-Oshana asserts that the arbitrator was "unqualified" because he "has no law degree" and his "experience shows nothing related to public policy employment issues, in particular claims under the Labor Code." She does not develop the argument further or cite any authority to support the proposition that these are grounds for vacating an arbitration award. They are not. (§ 1286.2.) She does not claim that either arbitration agreement required FINRA to provide an arbitrator who possessed a law degree and particularized experience in deciding Labor Code claims. Neither agreement includes

14

any such requirement.  She does not assert that any FINRA rule was violated.  We find no evidence of any rules violation in the record.

"It is the duty of counsel by argument and the citation of authorities to show that the claimed error exists."  (*In re Estate of Randall* (1924) 194 Cal. 725, 728 (*Randall*); see Cal. Rules of Court, rule 8.204(a)(1)(B).)  "We are not bound to develop appellants' arguments for them."  (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830.)  "'Appellate briefs must provide argument and legal authority for the positions taken.  "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived."'  [Citation.]"  (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.)  Because Tawfik-Oshana failed to support her complaints about the arbitrator's purported lack of qualifications with reasoned argument or citations to authority, we reject them as not properly raised.  (*Randall*, at p. 728.)

### E.  Labor Code Claims

Relying on *Hoover*, Tawfik-Oshana asserts that her Labor Code claims "derive from the 'public policies' imbedded in the Labor Code" and that "[t]he arbitration process may never be used as a vehicle to waive those statutorily protected rights."  She complains that the trial court "intentionally ignored" statements in *Hoover* that "[a]s a general rule, state statutory wage and hour claims are not subject to arbitration" and that "[a]n individual arbitration agreement also does not apply to an action to enforce statutes governing collection of unpaid wages, which 'may be maintained without regard to the existence of any private agreement to arbitrate . . . .'  ([Lab. Code,] § 229.)"  (*Hoover*, *supra*, 206 Cal.App.4th at pp. 1206-1207.)

We reject the contention that the public policies imbedded in the Labor Code preclude arbitration of Tawfik-Oshana's Labor Code claims.  The FAA applies here.  The United States Supreme Court has repeatedly held that where the FAA applies, it preempts

conflicting state laws. (E.g., *Southland*, *supra*, 465 U.S. at p. 16; *Perry*, *supra*, 482 U.S. at p. 491.)

*Perry* involved a stockbroker's claim for unpaid commissions under Labor Code section 229, which provides that wage collection actions can be litigated in court notwithstanding any private agreement to arbitrate. The trial court denied the defendant employer's motion to compel arbitration. The California Supreme Court affirmed. The United States Supreme Court reversed. The court held that the "clear federal policy" in favor of arbitration "places [section] 2 of the Act in unmistakable conflict with California's [section] 229 requirement that litigants be provided a judicial forum for resolving wage disputes. Therefore, under the Supremacy Clause, the state statute must give way." (*Perry*, *supra*, 482 U.S. at p. 491.) California cases applying the FAA are in accord. (E.g., *Baker*, *supra*, 216 Cal.App.3d at pp. 1266-1267 [holding that Baker's claim for overtime pay, even if based on a statutory right under former Labor Code section 510, was subject to arbitration because "[t]he [FAA] preempts our state law in this area."].)

*Hoover* does not advance Tawfik-Oshana's position.[3] In *Hoover*, a sales agent for an insurance company sued her former employer for violations of the Labor Code. (*Hoover*, *supra*, 224 Cal.App.4th at pp. 1197, 1199-1200.) The trial court denied the employer's motion to compel arbitration. (*Id.* at p. 1201.) The Court of Appeal affirmed, holding that the employer waived its right to seek arbitration. (*Id.* at p. 1198.) The court added that arbitration could not be compelled even in the absence of waiver because the employer had not shown that the contract at issue involved interstate commerce. (*Id.* at p. 1207.) The court noted that "Hoover was not an employee of a national stock brokerage firm or the employee of a member of a national stock exchange." (*Id.* at

---

[3]     At oral argument, Tawfik-Oshana conceded that *Hoover* did not support her position, and she withdrew all arguments relying on that case.

16

p. 1208.) Thus, "the FAA did not apply [and] the exception favoring federal preemption and arbitration did not operate." (*Ibid.*)

*Hoover* is inapposite because the contracts at issue here involved interstate commerce. The trial court expressly so found when it ordered the parties to arbitration. Substantial evidence supported the trial court's finding. Wells Fargo submitted evidence that it is a nationwide financial services organization providing a full range of investment and brokerage services, that it is regulated by SRO's such as FINRA, and that "as a registered securities broker/dealer[, it] was at all relevant times . . . a member of the FINRA." It submitted evidence that Tawfik-Oshana was at all relevant times during her employment a registered representative of FINRA and an associated person of Wells Fargo, a FINRA member firm. "It is well settled that disputes between a member of a national stock exchange and its employee are governed by the [FAA] where there is a binding arbitration agreement." (*Baker*, *supra*, 216 Cal.App.3d at p. 1263.) "State and federal courts must enforce the [FAA] with respect to all arbitration agreements covered by that statute." (*Marmet Health Care Center, Inc. v. Brown* (2012) ___ U.S. ___ [132 S.Ct. 1201, 1202].) Tawfik-Oshana's reliance on *Hoover* is misplaced.

To the extent that Tawfik-Oshana contends that *Armendariz* prohibits arbitration of her Labor Code claims, we reject the contention. In *Armendariz*, the California Supreme Court addressed two different grounds for invalidating mandatory arbitration provisions in employment contracts, unlawfulness and unconscionability. (*Armendariz*, *supra*, 24 Cal.4th at p. 113.) Addressing lawfulness, the court held that antidiscrimination claims under California's Fair Employment and Housing Act (Gov. Code, § 12900 et seq.) (FEHA) are arbitrable "*if* the arbitration permits an employee to vindicate his or her statutory rights." (*Armendariz*, at p. 90.) "[F]or such vindication to occur, the arbitration must meet certain minimum requirements, including neutrality of the arbitrator, the provision of adequate discovery, a written decision that will permit a limited form of judicial review, and limitations on the costs of arbitration." (*Id.* at pp. 90-91; *Boghos v.*

17

*Certain Underwriters at Lloyd's of London* (2005) 36 Cal.4th 495, 505.)  The *Armendariz* court held that arbitration provisions that do not satisfy the five minimum requirements are contrary to public policy and "grounds for invalidating or revoking an arbitration agreement and denying a petition to compel arbitration . . . ."  (*Armendariz*, at p. 110.)  But those minimum requirements have no application here.

*Armendariz*'s prohibition against the arbitration of claims asserting unwaivable statutory rights arose in the context of "a mandatory employment arbitration agreement . . . which an employer imposes on a prospective or current employee as a condition of employment."  (*Armendariz*, *supra*, 24 Cal.4th at p. 90.)  There is no employment agreement at issue here.  Tawfik-Oshana does not challenge the "written employment offer" that she accepted on December 13, 2007, nor has she included a copy of that written offer in the record on appeal.  The Form U4 is not an employment contract.  (See *Circuit City Stores, Inc. v. Adams* (2001) 532 U.S. 105, 113, citing *Gilmer v. Interstate/Johnson Lane Corp.*, *supra*, 500 U.S. 20, 25, fn. 2.)  Nor was it imposed on Tawfik-Oshana by Wells Fargo.  "The Form U4 is a contract between the regulatory organization . . . and the individual registrant.  [Citation.]"  (*Valentine*, *supra*, 174 Cal.App.4th at p. 613.)  To the extent it was "imposed" on Tawfik-Oshana, it was imposed by federal and state law, not by Wells Fargo.  (17 C.F.R. § 240.15b7-1; 10 Cal. Code Regs., § 260.210.)

The note that Tawfik-Oshana signed is not an employment contract either.  It is prominently titled "PROMISSORY NOTE."  It contains all of the terms that one would expect to find in a promissory note given as security for a loan.  Among other things, it states the principal amount of the loan and the interest rate, describes prepayment and lien terms, and specifies "events of default . . . ."  The note does not include terms that one would expect to find in a written employment agreement.  It says nothing about Tawfik-Oshana's starting date or title.  It does not describe her compensation or her entitlement to health care or other benefits.  It refers to the $650,000 she received as a

18

"loan" rather than as a "sign-on bonus." It says nothing about the possibility of an additional $350,000 bonus that Tawfik-Oshana claims she was promised. It does not state where her office would be located, although she claims she was promised assignment to "the high-volume, stable Westgate office in San Jose." The note cannot reasonably be considered an employment contract.

Even if it could be, nothing in the record suggests that it was a condition of Tawfik-Oshana's employment. (*Armendariz*, *supra*, 24 Cal.4th at p. 90.) She declared that neither the regional sales manager who offered her the position "nor anyone at Wells Fargo ever suggested the document was negotiable" and that she "had no choice but to sign" all of the documents she was presented with on her first day since she had already quit her job at WAMU. But she did not declare that anyone told her that she had to sign the note as a condition of her employment or that it was not negotiable. Nor could she. The note expressly stated that "[t]he Undersigned has reviewed the terms of this Note and has participated in its drafting . . . ." *Armendariz*'s minimum requirements were never triggered here because neither of the arbitration provisions that Tawfik-Oshana challenges was contained in a mandatory employment arbitration agreement that Wells Fargo imposed on her as a condition of her employment. Her reliance on *Armendariz* is misplaced.

### F.  Business and Professions Code Claim

Tawfik-Oshana contends that the trial court erred in compelling arbitration of her Business and Professions Code claim. Relying on *Broughton v. CIGNA Healthplans of California* (1999) 21 Cal.4th 1066 (*Broughton*) and *Brown v. Ralph's Grocery Co.* (2011) 197 Cal.App.4th 489 (*Brown*), she argues that the claim is not arbitrable because she is "seeking to act as a private attorney general to enjoin future unlawful practices on behalf of the general public." We reject the argument.

19

In *Broughton*, the California Supreme Court held that claims under the Consumers Legal Remedies Act (CLRA) for injunctive relief to protect the public from deceptive business practices are nonarbitrable. (*Broughton*, *supra*, 21 Cal.4th at pp. 1082-1084.) CLRA claims seeking damages are "fully arbitrable and should be severed from an injunctive relief action when . . . a plaintiff requests both types of relief." (*Broughton*, at p. 1072.) The court later extended *Broughton* to prohibit arbitration of consumer claims to enjoin unfair competition and deceptive advertising under the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq. (UCL)) where the injunctive relief is sought to prevent further harm to the public at large rather than simply to redress or prevent injury to a plaintiff. (*Cruz v. PacifiCare Health Systems, Inc.* (2003) 30 Cal.4th 303, 307, 315-316, 317-320 (*Cruz*).)

In *Brown*, the Court of Appeal held that a waiver in an arbitration agreement of an employee's right to pursue a representative action under the Labor Code Private Attorneys General Act of 2004 (PAGA)[4] was unenforceable under California law. (*Brown*, *supra*, 197 Cal.App.4th at p. 494.) Relying in part on *Broughton* and *Cruz*, the *Brown* court concluded that the FAA did not preempt state law holding such waivers unenforceable because the law did not conflict with the purposes of the FAA. (*Brown*, at pp. 494, 501-502.) Several years later, the California Supreme Court held in *Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348 (*Iskanian*) that "an arbitration agreement requiring an employee as a condition of employment to give up the right to bring representative PAGA actions in any forum is contrary to public policy" and that the FAA does not preempt that state court rule. (*Iskanian*, at pp. 360, 384.)

---

[4] PAGA "authorizes an employee to bring an action for civil penalties on behalf of the state against his or her employer for Labor Code violations committed against the employee and fellow employees, with most of the penalties going to the state." (*Iskanian*, *supra*, 59 Cal.4th at pp. 360, 378-382; Lab. Code, §§ 2698-2699.5.)

None of these cases help Tawfik-Oshana. Unlike *Broughton* and *Cruz*, her case was not a consumer case. Unlike in *Brown*, her complaint did not invoke PAGA, seek civil penalties, or allege compliance with the administrative prerequisites to pursuing a PAGA action. (Lab. Code, § 2699.3, subd. (a); see *Arias v. Superior Court* (2009) 46 Cal.4th 969, 981 ["Before bringing a civil action for statutory penalties, an employee must comply with Labor Code section 2699.3."].) There is no evidence in the record that she satisfied those prerequisites.

Unlike in the above cases, Tawfik-Oshana's complaint contained no hint that she was asserting a representative claim or seeking to act as a private attorney general. (Compare *Cruz*, *supra*, 30 Cal.4th at pp. 308-309, 315.) Her complaint did not mention other aggrieved persons or suggest in any way that she sought relief on behalf of anyone but herself. She alleged that Wells Fargo "failed to pay Plaintiff wages, used the illusory promise of a sign-on bonus, then attempted to recoup that bonus as a 'loan' in violation of the Labor Code." Her complaint did not mention PAGA. Instead, it invoked the "California Unfair Trade Practices Act (a.k.a. 'UCL,' Unfair Competition Laws, California Bus. & Prof. Code Sec. 17200 et seq.)" She asserted that Wells Fargo's alleged violations of the Labor Code constituted unfair competition and unfair business practices under the UCL. It was not until Wells Fargo petitioned to compel arbitration that Tawfik-Oshana argued in her opposition brief that she was seeking an injunction under the UCL "on behalf of herself and the citizens of California to enjoin defendant's violations of California's employment laws and regulations." On this record, the trial court properly rejected that argument. The trial court did not err in compelling arbitration of Tawfik-Oshana's individual Business and Professions Code claim. (See *Cruz*, *supra*, 30 Cal.4th at pp. 317-320 [reiterating arbitrability of UCL claims for restitution or disgorgement].)

21

## G. Unconscionability

Tawfik-Oshana contends that the trial court erred in denying her motion to vacate and in confirming the arbitration award because the arbitration agreements that she signed were procedurally and substantively unconscionable. We disagree.

" '[U]nconscionability has both a "procedural" and a "substantive" element,' the former focusing on ' "oppression" ' or ' "surprise" ' due to unequal bargaining power, the latter on ' "overly harsh" ' or ' "one-sided" ' results. [Citation.] 'The prevailing view is that [procedural and substantive unconscionability] must *both* be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability.' [Citation.] But they need not be present in the same degree. 'Essentially a sliding scale is invoked . . . .' In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." (*Armendariz*, *supra*, 24 Cal.4th at p. 114.)

Tawfik-Oshana argues that the Form U4 arbitration agreement was procedurally unconscionable because it was a contract of adhesion imposed on her with no opportunity for negotiation. We reject the argument.

A contract of adhesion is " 'a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." (*Armendariz*, *supra*, 24 Cal.4th at p. 113.) The Form U4 arbitration agreement does not fit that definition. The Form U4 was a contract between Tawfik-Oshana and FINRA, not between her and Wells Fargo. (*Valentine*, *supra*, 174 Cal.App.4th at 613.) It was not drafted by Wells Fargo. (See *Desiderio v. National Assn. of Securities Dealers, Inc.* (2nd Cir. 1999) 191 F.3d 198, 207 ["the arbitration clause in Form U-4 was drafted by the NASD in cooperation with other self-regulatory organizations" and approved by the SEC].) To the extent it was "imposed" on Tawfik-Oshana, it was imposed by law, not by Wells Fargo. (17 C.F.R.

22

§ 240.15b7-1; 10 Cal. Code Regs., § 260.210.)  Wells Fargo had no choice in the matter. Federal law prohibits it from engaging in securities transactions unless all natural persons "associated with" it who effect or are involved with effecting such transactions are registered or approved according to certain standards, "including . . . submitting and maintaining all required forms . . . ."  (17 C.F.R. § 240.15b7-1.)  California law similarly requires that "[u]pon employment of an individual as an agent," registered broker-dealers like Wells Fargo must obtain and file "a properly executed application for registration, on the [Form U4] . . . ."  (10 Cal. Code Regs., § 260.210, subds. (a), (b).)  The Form U4 that Tawfik-Oshana signed was not a contract of adhesion.

Even if we assume that it was, it did not render the arbitration provision procedurally unconscionable.  Procedural unconscionability "focus[es] on '"oppression"' or '"surprise"' due to unequal bargaining power."  (*Armendariz*, *supra*, 24 Cal.4th at p. 114.)  Wells Fargo did not wield superior bargaining strength in obtaining the Form U4 from Tawfik-Oshana.  The law required it to obtain and Tawfik-Oshana to provide her signature on the form.  The form cannot have come as a surprise to Tawfik-Oshana.  She had worked in the securities industry since at least 1993 and was merely transferring her registration to her latest employer.  Nor can she claim to have been surprised by the arbitration provision.  By signing the form, she expressly acknowledged "that I have read and understand the items and instructions on this form . . . ."  We conclude that the Form U4 arbitration provision was not procedurally unconscionable.

Because procedural and substantive unconscionability must both be present before a court will refuse to enforce a contract or clause under the doctrine of unconscionability, our conclusion that the Form U4 arbitration agreement was not procedurally unconscionable makes it unnecessary for us to address Tawfik-Oshana's contention that it was also substantively unconscionable.  (*Crippen v. Central Valley RV Outlet* (2004) 124 Cal.App.4th 1159, 1167.)  We conclude that unconscionability did not render the Form U4 arbitration provision unenforceable.

23

We have rejected Tawfik-Oshana's other challenges to the Form U4 arbitration provision. Thus, the trial court did not err in compelling arbitration of Tawfik-Oshana's claims under that provision.[5] Tawfik-Oshana did not establish that the arbitrator committed misconduct or exceeded his powers by deciding issues that were properly before him. It follows that the trial court did not err in confirming the arbitrator's award after Tawfik-Oshana failed to establish a statutory ground for vacating it. (§ 1287.4.)

## III. Disposition

The judgment is affirmed.

---

[5] This conclusion makes it unnecessary for us to address Tawfik-Oshana's contention that the arbitration provision in the promissory note was unenforceable. She does not dispute that both arbitration provisions separately covered the claims she asserts. She raises the same challenges to both arbitration provisions. We have rejected those challenges with respect to the Form U4 provision. Even if the arbitration provision in the note was unconscionable or otherwise unenforceable, Tawfik-Oshana was required to arbitrate her claims under the Form U4 arbitration provision.

_____
Mihara, J.

WE CONCUR:


_____
Premo, Acting P. J.


_____
Elia, J.